DENA MARIE LEWIS, nka DENA MARIE SMISEK, Appellant, v. PHILLIP RAY HICKS, Respondent.

No. 22835

December 22, 1992 843 P.2d 828

---

[Rehearing denied April 21, 1993]

*William R. Phillips & Associates* and *Bruce I. Shapiro,* Las Vegas, for Appellant.

*L. Earl Hawley,* Las Vegas, for Respondent.

## OPINION

*Per Curiam:*

In an action by Dena Lewis to increase Phillip Hicks' child support obligation, the trial court affirmed a recommendation of the domestic referee setting support at less than half of the statutorily prescribed amount. For the reasons set forth below, we find that the trial court erred.

In 1984, Dena Lewis and Phillip Hicks had a child, Tiffanie Hicks, out of wedlock. Both parents subsequently married others. In 1986, Lewis and Hicks stipulated to paternity and joint legal custody of Tiffanie. The parties further agreed that Lewis would take physical custody when Tiffanie entered kindergarten, and that Hicks would pay $150 per month in child support. In April, 1991, Lewis filed a motion for primary physical custody of the child, and for an increase in child support. Hicks conceded primary physical custody, but contested the increase in support.

Hicks submitted an affidavit of financial conditions showing that he had net assets of $12,797, a "total net income"[1] of $3,614 per month, and total expenses of $3,522 per month. Hicks' gross monthly income was $3,069. Lewis submitted an affidavit showing that she had net assets of $20,500, a total net income of $2,750 per month, and total expenses of $1,921 per month. Lewis' gross monthly income was $900.

The domestic referee recommended increasing the child support obligation to $242 per month. In support of this recommendation, the referee made only one finding of fact: the surplus of Hicks' total net income over his expenses was $92. The referee formulated an award by adding this surplus to the prior support obligation of $150 per month. The referee further recommended that the court increase the support obligation to $392 by July 1, 1993. The trial court affirmed the referee's recommendation without making any additional findings of fact.

Nevada imposes upon both parents the duty to provide a child necessary maintenance, health care, education, and support. NRS 125B.020. This duty extends to all children, whether or not legitimated. NRS 125B.010. Government and private researchers

---

[1] "Total net income" includes the income of the parent's spouse and deductions for federal income tax, social security and retirement withholdings. Because the parent's "total net income" includes the earnings of the parent's spouse, it may exceed the parent's gross income, which is based solely upon the earnings of the parent.

have amply documented the deficient support that children receive upon dissolution of a family unit. Traditionally, judges exercised broad discretion in awarding child support. This judicial discretion "resulted in support awards so low that they left children and their usually female caretakers at poverty or near-poverty levels." Marianne Takas, U.S. Dep't of Health and Human Services, The Treatment of Multiple Family Cases under State Child Support Guidelines 1 (1991). Judicial discretion also led to great variations in awards "from court to court, and from case to case, undermining respect for orders." *Id.* As a response to this growing problem, the Congress passed the Child Support Enforcement Amendments of 1984, Pub. L. No. 98-378, 98 Stat. 1305 (1984), which encouraged states to develop numerical guidelines for setting child support awards. *Id.*

Nevada responded to this entreaty with NRS 125B.070, which sets a parent's "obligation for support" of one child at the lesser of $500 or 18% of his "gross monthly income." NRS 125B.070(1)(b).

> The percentage of income approach reflects a public policy that after a family separation, parents should spend on their children the approximate percentage of income that they would have had the family stayed together. At the same time, it reflects a judgment that support amounts should be easily determined for maximum predictability and judicial economy.

*Treatment of Multiple Family Cases,* at 6.

NRS 125B.070(1)(a) defines "gross monthly income" as "the total amount of income from any source of a wage-earning employee . . . after deduction of all legitimate business expenses, but without deduction for personal income taxes, contributions for retirement benefits, contributions to a pension *or for any other personal expenses.*" (Emphasis added.)

Gross monthly income is relatively easy to calculate because it allows for few deductions. Nevada's Senate Judiciary Committee considered alternatives to "gross monthly income" but decided against them. A spokeswoman for the attorney general testified:

> The concern is that if you allow deductions for other expenses . . . unless you put something in there like the term 'reasonable,' . . . the court is going to have to decide what is reasonable in every case. What you have done if you do this, is throw more discretion to the court and you have thrown the percentages out of whack.

*Child Support, 1987: Hearings on A.B. 424 Before the Senate*

*Committee on the Judiciary,* 64th Leg. Sess. (1987) (statement of Nancy Angres, Deputy Attorney General, Welfare Division).

Nevada's statute follows the national trend in treating parental income and the number of children supported as the "basic factors" for calculating the award. *Treatment of Multiple Family Cases,* at 2. The sum calculated is presumed to be appropriate. NRS 125B.080(5). However, Nevada has also followed the national trend in a "second and continuing wave of guideline development" which increases "The responsiveness of guidelines to a variety of factors once viewed as exceptional, but which are, in fact, common." *Id.; see* NRS 125B.080(9). In deciding the amount of a child support award, a court may deviate from the formula based upon explicit findings of fact related to these factors. NRS 125B.080(6), (9).

In the present case, the trial court deviated from the statutory formula. Eighteen percent of Hicks' gross monthly income exceeded the $500 statutory cap. Therefore, under the formula, the court should have awarded child support of $500 per month.

"[A]pplication of the formula must be the rule, and deviation from the formula for the benefit of the secondary custodian must be the exception." Barbagallo v. Barbagallo, 105 Nev. 546, 552, 779 P.2d 532, 536 (1989); *see* NRS 125B.080(4). When deviating from the formula, the trial court must "set forth findings of facts as to the basis for the deviation . . . . The 'basis for the deviation' must be found in the unfairness, the injustice, which may result to the secondary custodian . . . ." *Id.*

The referee made only one finding, that the surplus of Hicks' total net income over his expenses was ninety-two dollars per month. The trial judge affirmed the referee's decision without making any additional findings. This finding reveals little about Hicks' ability to pay, or the injustice of requiring him to pay the statutory amount. Thus, the trial court erred by failing to set forth sufficient factual findings to support a deviation from the formula. NRS 125B.080(6).

Respondent contends that the trial court properly exercised its discretion by formulating an award based upon Hicks' surplus income. Traditionally, this court recognized that the trial court had "broad discretion" in setting child support awards. Atkins v. Atkins, 50 Nev. 333, 337, 259 P. 288, 289 (1927). The *Atkins* court based this broad discretion upon a statute which directed the trial judge to make the "most expedient award under the circumstances." *Id.* at 336-37, 259 P. at 289 (citing Act of Nov. 28,

1861, First Regular *Session of the Legislative* Assembly of the Territory of Nevada, *reprinted in* Nevada Revised Laws, 5840, § 24 (1912)). However, under the revised child support laws, the legislature has limited the exercise of this discretion to the confines of the present statutory scheme. Although the trial judge's discretion will continue to play an important role within the confines of the statutes, it cannot go beyond them.

In accordance with this principle, we have consistently found error where the trial court invented its own formula for calculating support awards. *See* Hoover v. Hoover, 106 Nev. 388, 389, 793 P.2d 1329, 1330 (1990); *Barbagallo,* 105 Nev. at 550, 779 P.2d at 535.

In the present case, the referee devised, and the trial judge approved, a new formula. The referee summed Hicks' *net* monthly salary and his spouse's income, then subtracted his total expenses. The referee added this surplus to the prior support obligation of $150 per month, for a total child support obligation of $242 per month. This formula represents a significant departure from the statutory scheme.

The formula relies on Hicks' net income rather than his gross income. Hicks' net income includes deductions for federal income tax, social security, and retirement benefits. However, under NRS 125B.070(1)(a), child support awards must be calculated from "gross monthly income," which specifically excludes these deductions.

The referee's formula also includes the income of the parent's spouse. The statutory scheme does not authorize consideration of spousal income. In fact, the Nevada Legislature rejected a proposal to include spousal income. A.B. 424, 64th Leg. Sess. of 1987, Legislative History, *Child Support,* 1987, at 76 (1987). Although no state requires courts to consider spousal income, "[s]ome states allow consideration of new spouse income in the exercise of judicial discretion, in certain circumstances, or in an indirect manner." *Treatment of Multiple Family Cases,* at 21. A trial judge might properly consider spousal contributions where they have a significant impact on recognized statutory factors, such as the parents' standards of living or their relative financial means. However, Nevada law does not authorize using spousal income directly.

The most troubling aspect of the referee's formula is its consideration of all of Hicks' expenses. The statute specifically requires that child support awards be calculated from gross income and exclusive of "any other personal expenses." NRS 125B.070(1)(a). The legislature's purpose in using "gross monthly income" was to avoid judicial examination of the minutiae of a parent's finances. The referee's approach has reintro-

duced the evils which the legislature had attempted to avoid.[2] The expense-based approach requires a court to investigate the reasonableness of a parent's expenses, and it also encourages a parent to increase his expenses prior to a support hearing.

In his brief, Hicks indicates that his marriage has broken down. Hicks may also be having financial problems. The referee may have felt sympathy for Hicks' plight and attempted to moderate his burden by raising the child support payments slowly.[3] The referee's decision would thus be a result of her own balancing of the equities.

The referee's balancing suffers from the same deficiencies which prompted federal and state legislation imposing formulas. Hicks is paying much less child support than the statute requires. In her decision, the referee acknowledged that Hicks should pay more in the future when he is able. Because Lewis appeared able to cover for Hicks' deficient support, the referee allowed him to partially avoid his duty to Tiffanie.

Hicks contends that this court should affirm the trial court's decision because Lewis is capable of assuming the added financial burden. In effect, he argues that so long as the needs of the child are met the trial court should have unfettered discretion in determining how to supplement the income of the custodial parent. Hicks' contention lacks merit.

Child support is not calculated as a supplement to the presumably inadequate means of the custodial parent. NRS 125B.070 specifies a parent's duty of child support according to the parent's means rather than according to the child's needs. Although the ultimate policy objective may be the welfare of the child, the legislative scheme implements this policy by focusing the court's attention upon a parent's statutory duty to provide a fixed percentage of his income as support. Barring special circumstances, the legislature has shifted the focus of the courts from a general

---

[2]This case illustrates the problems which can arise. In her motion for reconsideration, Lewis was forced to argue the minutiae of Hicks' expenses, including the legitimacy of long distance calls, his food and dry cleaning bills, his utilities and credit card debts. Neither judicial economy nor the best interests of the parties are served by a formula which requires that the parties litigate $77 dry cleaning bills.

[3]The referee stated that Lewis could reapply for the full $500 in 1993. Hicks argued before the trial court that, given his reliance on the continued $150 obligation for support, it was within the trial court's discretion to raise the support obligation in increments. Hicks has not made this argument on appeal.

In the present case, we would still find that the trial court abused its discretion because, even after two years, Lewis would receive only $317 per month with no assurance that the court would subsequently increase the obligation to $500.

inquiry into the best interests of the child to a specific inquiry of whether the noncustodial parent is satisfying the statutory support obligation. Where no special circumstances exist, courts must focus exclusively upon the noncustodial parent's duty to pay a fixed percentage of income.

When judges balance the equities, it may be too easy for them to relieve a parent of his duty if the other parent is capable of taking the extra burden. Hicks contends that the referee must balance the interests of the child against the interests of the noncustodial parent, but that "the large surplus of the mother does not weigh the issue in favor of the child." Such an analysis is appropriate only after the trial court has found special circumstances as listed in NRS Chapter 125B. In the instant case, the trial court could not deviate from the formula because it failed to explicitly find such circumstances. NRS 125B.080(6).

Furthermore, on this record the trial court could not make findings sufficient to rebut the statutory presumption in favor of the formula. "In determining whether an injustice is present [so as to justify deviation from the formula] the trial court should make reference to the factors and considerations in [NRS 125B.080(9)] . . . , with principal concern being given to the standard of living of the parties, their earning capacity and their relative financial means."[4] *Barbagallo,* 105 Nev. at 552, 779 P.2d at 536-37.

1. *Earning capacity and relative financial means.*

Lewis has net assets totalling $20,500. Hicks has net assets of $12,700. Although Lewis has slightly greater assets, Hicks' income of $3,069 per month is much greater than Lewis' income of $900 per month. These facts favor raising Hicks' child support obligation, rather than reducing it.

Hicks contends that NRS 125B.080(9)(1), which lists as a factor "the relative income of both parents," authorizes the kind of formula which the referee employed. Hicks argues that, under this provision, the referee and trial court properly considered the disparity between his net surplus of $92 per month and Lewis' net surplus of $800 per month. However, "net surplus" is not "income" within the meaning of NRS 125B.080(9)(1). Hicks' argument is persuasive only if the court examines his net income, an analysis which represents a significant departure from the

---

[4]With the repeal of NRS 125B.060, the courts no longer have explicit statutory authorization to consider the parents' standard of living or their financial means other than from income. As noted in *Barbagallo,* these factors can be derived from other provisions in Chapter 125B. *Barbagallo,* 105 Nev. at 551 n.4.

statutory scheme.[5] Because Hicks' gross monthly income is more than three times Lewis' income, the trial court could not rely on NRS 125B.080(9)(1) to support a reduction in his support obligation.

### 2. *Standard of living.*

The record indicates no great disparity between the parents' standards of living. Lewis' house has a market value of $83,000. Hicks' house has a market value of $93,000. Aside from two automobiles each, neither parent holds significant personal property. There is no other evidence in the record that would indicate disparity in their living standards. Thus, this factor could not support the trial court's judgment.

### 3. *Other factors listed in NRS 125B.080(9).*

In addition to these principal factors, Hicks relies on NRS 125B.080(9)(e), which authorizes the court to consider "the responsibility of the parents for the support of others." The legislature has not yet resolved the question of how courts should apply NRS 125B.080(9)(e) in multiple family cases. *See* Report of Family Law Section of State Bar of Nevada, "Child Support Statute Review Committee Report," 26-31 (August 1, 1992). While declining to impose any formulaic adjustment, this court has acknowledged that trial courts may exercise their discretion to modify support awards based upon the noncustodial parent's prior or subsequent family obligations. Hoover v. Hoover, 106 Nev. 388, 389, 793 P.2d 1329, 1330 (1990), Scott v. Scott, 107 Nev. 837, 840-41, 822 P.2d 654, 656 (1991).

Although application of NRS 125B.080(9)(e) is within the sound discretion of the trial court, the trial court should apply it

---

[5]Where a noncustodial parent has high, unavoidable expenses (e.g., continuing medical treatments which are not covered by insurance), the parent might not be able to meet the support obligation even though he or she has a substantial income. NRS 125B.080(4) implicitly recognizes the court's power to set a lesser support obligation based upon the noncustodial parent's inability to pay. Hicks' financial affidavit does not set forth any unusually large, unavoidable expenses.

NRS 125B.080(4) states:

> Notwithstanding the formulas set forth in paragraph (b) of subsection 1 of NRS 125B.070, the minimum amount of support that may be awarded by a court in any case is $100 per month per child, unless the court makes a written finding that the obligor is unable to pay the minimum amount. Willful underemployment or unemployment is not a sufficient cause to deviate from the awarding of at least the minimum amount.

cautiously. "An estimated 75% of divorced persons remarry, most within a few years of their divorce. Divorced men in particular tend to remarry quickly, and often go on to have other children, or at least to provide day-to-day support to a family with stepchildren." *Treatment of Multiple Family Cases,* at 2-3. By weighing this factor too heavily, trial courts could allow a substantial percentage of child support cases to fall outside of the statutory formula, thus undermining the legislation's purpose of promoting adequate and uniform support awards.

The present case is typical in that both Lewis and Hicks started new families. Hicks has a spouse and a four year old son. Offsetting the burden of supporting a new family, Hicks also has the benefit of his wife's income of $1,089 per month. Because every case presents a unique combination of circumstances and concerns, we cannot say that a trial court's decision to reduce support based upon family obligations like those of Hicks would invariably rise to the level of abuse of discretion. However, such a decision should be the exception rather than the rule.

Accordingly, we vacate the order entered below and remand the case for a determination of Hicks' child support obligation which is consistent with NRS Chapter 125B.